(Nos. 4569, 4570, 4578, 4579, 4584, 4586, 4600, 4604, 4644, 4713— )

SCHUTTE AND KOERTING COMPANY, A CORPORATION; BEAUMONT-BIRCH COMPANY, A CORPORATION; SINGH COMPANY, A CORPORATION; GEORGE WILLY HARDWARE; JOSEPH CRONIN, d/b/a CRONIN ELECTRIC COMPANY; ROOTS-CONNERSVILLE BLOWER DIVISION OF DRESSER INDUSTRIES, INC., A PHILADELPHIA CORPORATION; CRANE COMPANY, A CORPORATION; MINNEAPOLIS-HONEYWELL REGULATOR COMPANY, A FOREIGN CORPORATION AUTHORIZED TO DO BUSINESS IN ILLINOIS; FARRIS ENGINEERING CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY; BRADLEY SUPPLY CO., A CORPORATION, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed September 20, 1957.*

RAPPAPORT, CLORFENE AND RAPPAPORT; WINSTON, STRAWN, SMITH AND PATTERSON; FELIX M. BUOSCIO; ENSEL, MARTIN, JONES AND BLANCHARD; MUSGRAVE, EWINS, PRICE AND NOTZ AND JOHN H. HANSON; BLUM, JACOBSON AND SHKOLER; BROOKS AND GRADY; AND DAVID M. RAVIN, Attorneys for Claimants.

LATHAM CASTLE, Attorney General; MARION G. TIERNAN AND BERNARD GENIS, Assistant Attorneys General for Respondent.

PER CURIAM.

These consolidated cases, known and referred to as the Coal Products cases, all involve claims for compen-

sation against the State of Illinois, growing out of the rendering of various services and furnishing of materials at the experimental Pilot Plant, which was constructed and operated at the instigation of the Illinois Coal Products Commission. The claims are alleged to total approximately $210,000.00.

At the outset, let us say that this consolidated case involves a voluminous transcript of testimony, together with innumerable exhibits, and is replete with legal and constitutional questions of fundamental and far reaching import.

The result, which we have arrived at after untold hours of consideration, represents our best judgment from the standpoint of the rights of the claimants on the one hand, and the people of the State of Illinois on the other within the Constitution and laws of the State of Illinois.

The Illinois Coal Products Commission, a temporary non-departmental legislative commission, was first created by the General Assembly in the year 1943. The total sum of $35,000.00 was appropriated to the Committee for the purpose of carrying out a demonstration test program for the investigation of and experimentation with Illinois coal products. In each of the years of 1945, 1947, 1949 and 1951, the Commission was created by an identical act of the General Assembly, and in each act a certain specified sum was appropriated for the identical purposes expressed in the 1943 act. Each of these biennial appropriations marked the extent of the Commission's power to expend funds during the particular biennium, with the exception of the 1949-1951 biennium, when a deficiency appropriation was also enacted by the 67th General Assembly, and approved June 4, 1951.

On December 1, 1949, the Illinois Coal Products Commission, through its Chairman, Senator Roland V. Libonati, and the claimant, Singh Company and Dr. Alamjit D. Singh, executed a document entitled, "Agreement Between Dr. Alamjit D. Singh, As Chemical Engineer, and The Singh Company With The Coal Products Commission".

It was admitted into evidence as claimant's exhibit No. 1, and reads as follows:

"THIS AGREEMENT made and entered into this 1st day of December, 1949 between the SINGH COMPANY, a corporation duly organized under the laws of the State of Illinois and having its principal office and place of business in the City of Chicago, County of Cook in said State, hereinafter referred to as the 'COMPANY' and the ILLINOIS COAL PRODUCTS COMMISSION, a Commission created by the General Assembly of the State of Illinois pursuant to Senate Bill 493, entitled 'An Act Creating a Commission to Carry Out a Demonstration Test Program for the Investigation of and Experimentation with Illinois Coal Products and Making an Appropriation Therefor', (Approved June 30, 1949), hereinafter referred to as the 'COMMISSION',

WITNESSETH THAT:

WHEREAS, the Commission is desirous of initiating and completing the program for coal demonstration tests provided for under said Act, and is further desirous of encouraging individual companies to co-operate with and continue said program; and

WHEREAS, the Commission, in the conduct of such program, is empowered under said Act, to employ such assistance and assistants as may be necessary, including a commercial research laboratory, and the SINGH COMPANY is organized to operate such a commercial laboratory, and the Commission is of the opinion that the employment of the SINGH COMPANY, including the services of DR. ALAMJIT D. SINGH would be of great advantage to the accomplishment and success of said program; and

WHEREAS, said Company, together with DR. ALAMJIT D. SINGH, are willing to undertake and to conduct such demonstration test program contemplated by said Act, under the terms and conditions thereof.

WHEREAS, the Commission in its desire to undertake this study and have test experiments conducted for the purpose of improving the marketability of Illinois coal by a chemical treatment formula perfected by DR. ALAMJIT D. SINGH, and further desires to employ DR. ALAMJIT D. SINGH to operate, regulate and supervise a pilot plant as chemical engineer in order to undertake the study of Illinois coals and coal products for the purpose of

determining the commercial feasibility of making Illinois coals more available for industrial use.

Now, THEREFORE, for and in consideration of the mutual convenants and agreements herein contained, IT IS MUTUALLY AGREED by and between the parties hereto as follows:

1. The Company, with DR. ALAMJIT D. SINGH, whose peculiar talents lie in this field, having perfected a formula and process experimentally tested, shall, under the direction of the Commission and as part of carrying out the provisions of said Act of the General Assembly, conduct a demonstration test program for the investigation of and experimentation with Illinois coal and coal products for the purpose of determining the commercial feasability of making Illinois coals more available for industrial and domestic use as a combustion agent and as a raw material, in view of its declining market for manufacturing and metallurgical purposes.

2. In connection with said program, the Company through DR. ALAMJIT D. SINGH agrees to supervise the construction, installation and operation of such laboratory and other equipment as directed by the Commission at 117th and Ewing Avenue, Chicago, Illinois, as they may deem advisable.

3. The demonstration test program, herein provided for, shall terminate when the sum of $100,000.00 shall have been expended by the Commission in connection therewith, and in any event on or before the 30th day of June, 1951; but, after the termination of said program herein provided, a future similar program may be conducted, or instituted, based upon the continued operation of the apparatus herein provided for, by such individuals or concerns desiring to participate by contribution or collateral services to the purposes of the program, and shall hereinafter collectively be referred to as the "PARTICIPANTS", under the terms and provisions of a certain agreement of even date herewith made and entered into between the Company and said Participants; it being understood and agreed that all such apparatus, by gift or purchase, shall be and remain the property of the Commission, except the buildings loaned to the program.

4. The Company shall retain all patent rights resulting from the work performed under this contract and the experiments connected therewith, but shall make available, without charge, non-assignable personal licenses to use in Illinois only any such patent rights to companies and individuals operating in the State of Illinois.

5. The Commission as and for compensation to said Company for carrying on said program as herein set forth will pay to said Company on progress requisitions for said Company, and said Company will accept in full payment hereunder the following amounts:

(a) On or before the tenth day of each calendar month an amount equal to the total sum expended or committed to be expended by the Company for services rendered, materials, supplies and equipment, and in addition thereto proper charges for overhead, administration and other reasonable charges incidental to conducting

said work performed by said Company hereunder during the preceding calendar month, (until said amount in the sum of $100,000.00 as appropriated under said Act is expended).

(b) On or before the 1st day of December, A. D. 1949, the SINGH COMPANY entered an agreement for the lease with option to purchase certain acreage located at 117th and Ewing Avenue, the same having been properly prepared by slag-fill for the erection of the buildings necessary to be used in conducting this experiment. Such expenses incidental thereto and taxes thereon shall be deemed an expense of the Commission.

FURTHER WITNESSETH, that the Commission hereby hires and employs DR. ALAMJIT D. SINGH and the SINGH COMPANY, in accordance with the following added agreements:

The chemical engineer agrees:

1. To make all preliminary plans, drawings and sketches for the placement of machinery.

2. To cooperate with the Commission in procuring equipment, materials, machinery, fuel products, etc., to be used in tests at the lowest possible cost to the Commission either upon a lease, lend or cash basis for the duration of the experiments.

3. To submit twelve (12) copies of a monthly report to be given the Commission on the progress of the work as might be necessary in connection with familiarizing interested citizens with the problem.

4. The chemical engineer agrees to make such plant changes, as are required, and to prepare all detailed plans and submit the same to the Chairman of the Commission for approval.

5. To consult with the Commission or its Chairman on all costs arising from the operation of the plant or its maintenance.

6. When operation is begun to place a competent and experienced person for inspecting all materials and work performed to represent the Commission.

7. The chemical engineer will also prepare the monthly estimates of cost upon, which the Commission must draw upon its funds. At least once each month during the active operating period, if required, or more often upon the request of the Commission to give all findings of tests necessary and in addition an inspection in order to determine whether the work performed and the equipment's use meets with the purposes of the Commission's existence.

The personal services of DR. ALAMJIT D. SINGH are the essence of this contract. Upon his withdrawal, the Commission may cancel the contract agreements upon written notice to the SINGH COMPANY.

The parties hereto may at any time cancel these Articles of Agreement by giving written notice for its termination within three (3) months of the date of the notice.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by the duly authorized officers and representatives of said parties the day and year first above written."

Dr. Singh, a chemical engineer, who later became president of the Singh Company, several years prior to the execution of this agreement had been requested by a previous Illinois Coal Products Commission to prepare a report on a process for improving the quality of Illinois soft coal, and making it more marketable.

He advised the members of the Commission of the work then being conducted in this field by the Institute of Gas Technology, and described the process, which he had developed, known as the Singh Process.

The Coal Products Commission, after considering this report, entered into a contract with the Institute of Gas Technology for further work on the Singh Process in October, 1944. At that time, Dr. Singh was supervisor of The Coal and Gasification Division of the Institute of Gas Technology, which was affiliated with the Illinois Institute of Technology.

In 1947, Dr. Singh left the Institute, and formed the Singh Company, An Illinois Corporation. In August of 1948, the Illinois Coal Products Commission requested Dr. Singh to draw up tentative plans for a pilot plant, together with a cost estimate. This contact between Dr. Singh and the Commission eventually culminated in the agreement heretofore referred to in December, 1949.

The term of this contract extended throughout the 1949-1951 biennium, and during this period the principal activities of Dr. Singh and the Singh Company was in the designing and constructing of the pilot plant, a photograph of which was introduced as an exhibit by claimant, Singh Company.

Two of the claimants in this consolidated case, namely, Minneapolis-Honeywell Regulator Company, a Foreign Corporation, and the Beaumont-Birch Company, a Corporation, contend that they entered into an agree-

ment through Dr. Singh, President of the Singh Company, to furnish certain materials during the 1949-1951 biennium; that such materials were delivered and accepted by Dr. Singh on behalf of and as an agent of the Coal Products Commission, and that their respective statements were never paid.

Minneapolis-Honeywell Regulator Company's claim is founded upon two written exhibits, exhibit No. 1 is a letter, dated April 13, 1951, signed by Dr. Singh, accepting a Minneapolis-Honeywell quotation in the amount of $20,971.05 for certain instruments, panel mounted equipment, locally mounted equipment, panelboard with instruments mounted and control valves to be delivered to the Singh Company at the pilot plant location on or before September 1, 1951.

Exhibit No. 2 is a like letter, dated May 21, 1951, signed by Dr. Singh accepting a Minneapolis-Honeywell quotation in the amount of $1,206.28 for certain thermocouple assemblies to be delivered to Singh Company at the pilot plant location on or before September 1, 1951.

Both of these letters contained the direction that they should be invoiced to the Illinois Coal Products Commission in care of Singh Company.

The evidence offered at the hearing established that these materials were delivered by Minneapolis-Honeywell, accepted by Dr. Singh, utilized in the construction of the pilot plant, and were satisfactory in all respects. It further appeared from the testimony of Dr. Singh that bids were solicited from five other companies prior to the acceptance of the Minneapolis-Honeywell bid.

A portion of this material was not delivered until after September 1, 1951. This time requirement, however, appears to have been extended by agreement of

the parties. Respondent made no attempt to dispute the fact that these materials were furnished in accordance with the agreement. Minneapolis-Honeywell contends that the Singh Company and Dr. Singh were acting as agents of the Illinois Coal Products Commission, and that, therefore, the contract was binding on the Commission. The respondent, however, contended during the hearings that the amount claimed for these materials, or at least the greater portion thereof, in the sum of $20,976.05, was paid by a state warrant issued by the Auditor of Public Accounts to the Singh Company on the Singh Company's invoice of July, 1951 to the Coal Products Commission as "monies expended or committed to be expended by the Singh Company for materials, etc.", and that, therefore, the State of Illinois has paid this obligation, and owes Minneapolis-Honeywell nothing.

Minneapolis-Honeywell, in answer to respondent's position, contends that, even though such sum was disbursed to the Singh Company by a state warrant, such a payment represents payment of that sum by the State of Illinois to the agent of the Coal Products Commission, and, therefore, should not be held to bar the claim of Minneapolis-Honeywell, which company has received no payment in any amount.

Dr. Singh's explanation of this situation was that such amount was included on the Singh Company's invoice to the Coal Products Commission, but that it was understood that Minneapolis-Honeywell should receive no payment until the equipment was delivered, even though the contract for the material had been entered into, and was binding.

He further testified that the money so received by the Singh Company on its invoice of July, 1951 to the

Commission was expended in the payment of obligations of the Coal Products Commission to other creditors and employees.

Counsel for the Singh Company acknowledge in their brief that the Singh Company received $20,971.05 invoiced by it on the Minneapolis-Honeywell order, and recognizes that respondent has a set-off in that amount against the Singh Company claim. Singh Company also confirms that Minneapolis-Honeywell has not received payment, and that its claim is proper.

This then simply resolves itself to one question, namely, was the Singh Company (and Dr. Singh) the agent of the Illinois Coal Products Commission, or was the Singh Company and Dr. Singh independent contractors? If the relationship was that of principal and agent, then, of course, the payment to the Singh Company of the major portion of the Minneapolis-Honeywell invoice would in no way bar Minneapolis-Honeywell in its claim. On the other hand, if the relationship between the Coal Products Commission and Dr. Singh and the Singh Company was that of independent contractor, then the obligation of respondent was satisfied by payment to the Singh Company, and Minneapolis-Honeywell's cause of action would lie against the Singh Company instead of the State of Illinois.

This then involves a construction of the 1949 contract between the Commission and Dr. Singh and the Singh Company. In construing this contract, we must look to the activities of the parties thereto, as well as the bare terms thereof, and will give weight to the interpretation that the parties to the contract have made with respect to its terms.

As we stated in *J. I. Simmons Company, Inc.,* vs. *State of Illinois,* 21 C.C.R. 503 at 516: "The courts of

this state have held that the interpretation of a contract made by the parties themselves will be given great weight''.

First, it appears from the terms of the contract that the Commission did not place the complete control and responsibility into the hands of Dr. Singh or the Singh Company to build the pilot plant. It provided in paragraph 2 that ''the Singh Company through Dr. Singh agrees to supervise the construction, installation and operation of such laboratory and other equipment *as directed by the Commission* at 117th and Ewing Avenue, Chicago, Illinois, as they may deem advisable''. It thus appears from the terms of the contract that the Commission would exercise the ultimate control of building the pilot plant. The evidence established that the Commission contracted directly with the Cronin Electric Company to provide the electrical work, and with the Illinois Concrete Construction Company to supply the necessary concrete work and material.

Secondly, there was no contract price agreed upon for the completed pilot plant. It appears from the testimony that this was an experimental type plant, which was not susceptible of being thus subject to a bid for a finished structure, but required considerable flexibility in the construction thereof.

Thirdly, the method of payment for the materials purchased was provided in paragraph 5 of the contract, being that the Singh Company would be compensated each month in an amount equal to the total sum expended, or committed to be expended, by the company for services rendered, materials, supplies and equipment.

Fourth, the materials were to be procured by Dr. Singh, who agreed *''to cooperate with the Commission*

in procuring equipment, materials, machinery, fuel products, etc., at the lowest possible cost to the Commission''; and was to make ''such plant changes as are required, to prepare all detailed plans, and submit same to the Chairman of the Commission for approval''; and to ''consult with the Commission or its Chairman'' on all costs arising from the operation of the plant or its maintenance. He was to place a competent and experienced person for the purpose of inspecting all materials and worked performed, and to represent the Commission; he was likewise to prepare monthly estimates of cost ''upon which the Commission must draw upon its funds'', and to perform inspections ''in order to determine whether the work performed and equipment use meets with the purposes of the Commission's existence''.

Fifth, the essence of the contract was the personal services of Dr. Singh, and that the Commission might cancel the agreement with Singh Company in the event of Dr. Singh's withdrawal.

Sixth, the contract was to terminate ''when the sum of $100,000.00 shall have been expended''. This provision, of course, was of absolute necessity in view of the fact that the Commission's own power to expend funds was limited to the amount of the 1949 appropriation, which was the sum of $100,000.00.

It is, therefore, apparent to us that Dr. Singh and the Singh Company were agents of the Coal Products Commission and not independent contractors. An additional element, which indicates a general recognition by the parties of this fact, is the very manner in which the numerous suppliers of materials invoiced their respective items. In each instance they were directed to the Illinois Coal Products Commission in care of the Singh Company.

Over the period of time that the operation was in effect, this method of invoicing was acquiesced in by the Commission. Although this is not controlling on the question, it is a strong factor in its determination, and indicates the intention of the parties.

This problem of distinguishing between the relationship of independent contractor and principal and agent has long been a difficult one. No single factor of this relationship is determinative. The right of control, which one has over another, who is performing services for him, is, in many instances, the determinative factor.

Here, the right of control, which the Commission had over the entire project in all of its aspects, was definite and certain.

We, therefore, hold that the Singh Company and Dr. Singh were the agents of the Illinois Coal Products Commission, and had the authority to bind the Commission in purchasing the materials for the pilot plant if, and only if, the Commission had the power and authority to make the purchases at that time.

With respect to this question, it is fundamental that all governmental agencies, departments and commissions are strictly circumscribed in their powers and authorities by the Constitution and statutes of the State of Illinois.

Chap. 127, Sec. 166 of the Ill. Rev. Stats., (1955 State Bar Association Edition), provides as follows:

"§ 166. Indebtedness exceeding appropriation prohibited.

No officers, institution, department, board or commission shall contract any indebtedness on behalf of the state, nor assume to bind the state in an amount in excess of the money appropriated, unless expressly authorized by law. 1919, June 10, Laws 1919, p. 946, §30."

In the case of *Fergus* vs. *Brady,* 277 Ill. 272 at pages 279 and 280, the Supreme Court stated:

"By the Criminal Code the making of a contract in excess of the amount of an appropriation subjects the offender to a fine not exceeding $10,000 and removal from his office, trust or employment. No right whatever can grow out of the commission of a crime and by the plain language of the Constitution *every claim or contract is utterly void if not within the amount of appropriation already made,* unless there is express authority of law for the creation of the debt or claim or the making of the contract. . . . An express authority is one given in direct terms, definitely and explicity, and not left to inference or to implication, as distinguished from authority, which is general, implied or not directly stated or given. An example of such express authority is found in one of the deficiency appropriations to the Southern Illinois Penitentiary, which had been paid, and serves only as an illustration. The authorities in control of the penitentiary are required by law to receive, feed, clothe and guard prisoners convicted of crime and placed in their care, involving the expenditure of money, which may vary on account of the cost of clothing, food and labor beyond the control of the authorities, and which could not be accurately estimated in advance for that reason, or by determining the exact number of inmates. To extend the meaning of the constitutional requirement that there shall be express authority of law for the creation of a debt or the making of an agreement or contract in excess of an appropriation for the purpose beyond the meaning we have given to it would destroy and nullify the provisions of the Constitution."

In *Coleman Oil Company* vs. *State of Illinois,* 10 C.C.R. 323, the recognized rule regarding the allowance of contractual claims is set forth:

"We have held in numerous cases that, where supplies have been furnished to the state on the order or request of an official authorized to purchase the same, and a bill therefor has been submitted within a reasonable time, but the same has not been approved and vouchered for payment before the lapse of the appropriation from which it is payable, without any fault or neglect on the part of the claimant, an award for the reasonable value of such supplies will be made, where at *the time of the purchase thereof, there were sufficient funds remaining unexpended in the proper appropriation to pay for the same."*

Therefore, it must appear that, at the time the materials furnished by the Minneapolis-Honeywell Regulator Company were contracted for, there were then unexpended funds in the appropriation covering the 1949-1951 biennium.

As we have heretofore stated, there had been appropriated in 1949 the sum of $100,000.00 to be expended by

the Coal Products Commission in that biennium. Subsequently, in 1951, an additional $88,000.00 was provided by a deficiency appropriation.

Apparently, sufficient funds were available at the time the contract was entered into with Minneapolis-Honeywell. The Singh Company had invoiced the Commission for $20,971.05 of the amount contracted, and had received a state warrant covering that amount. Respondent made no attempt to establish that the funds were depleted when the contract was made for the balance of the materials. If such was the case, respondent could have easily brought such fact to our attention. Not having done so, we assume that there were sufficient funds available for such purpose at that time.

Minneapolis-Honeywell vouchers were submitted at the various times the equipment was delivered. It, therefore, appears that the claims of the Minneapolis-Honeywell Regulator Company should be allowed in the amount of $22,177.33.

The claim of the Beaumont-Birch Company is based on claimant's exhibit No. 1, which was a letter signed by Dr. Singh, dated January 8, 1951, accepting the Beaumont-Birch Company's quotation of $2,000.00 for a vibro automatic weighing scale. This company was also directed to invoice the Illinois Coal Products Commission. Dr. Singh testified that this scale was received at the pilot plant location, was placed in use, and that bids were solicited from other firms prior to the acceptance of the Beaumont-Birch Company's bid.

The Singh Company billed the Coal Products Commission for the amount of $2,000.00 in their invoice of February 10, 1951, and received payment by state warrant. Beaumont-Birch, however, was never paid for

the reasons stated regarding the claim of Minneapolis-Honeywell. The Singh Company in its brief also acknowledges that the claim should be paid to the Beaumont-Birch Company, and that respondent, State of Illinois, should have a set-off against the Singh Company claim in the amount of $2,000.00.

Obviously, there were sufficient funds available in the appropriation applying to the 1949-1951 biennium when the indebtedness was contracted, inasmuch as the Singh Company was paid on their billing, which included this amount.

Therefore, the Beaumont-Birch Company's claim in the amount of $2,000.00 should be allowed.

The other claims involved in this consolidated case all arose after the expiration of the 1949-1951 biennium, and, therefore, it is necessary to consider the question as to what authority the Illinois Coal Products Commission and Dr. Singh and the Singh Company had at the respective times the materials and services were contracted for or furnished.

The claimants contend that the 1949 contract was extended verbally, and that the operation and construction of the pilot plant continued under the same procedure as it had during the previous biennium. Respondent contends that the oral extension of the 1949 contract is null and void. It is respondent's position that public policy does not permit individual members of a board to act without authority from such board itself acting at a regular or special meeting.

The record reflects that, on June 30, 1951, an enactment of the General Assembly was approved by the Governor, which enactment was identical to the 1949 enactment, and provided as follows:

"An Act creating a commission to carry out a demonstration test program for the investigation of and experimentation with Illinois coal products, and making an appropriation therefor.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

Section 1. There is created a commission consisting of two members of the Senate to be appointed by the President pro tempore thereof, two members of the House of Representatives to be appointed by the Speaker thereof, four members to be appointed by the Governor, two of whom shall have had experience in the development and production of coal. The commission shall conduct a demonstration test program for the investigation and experimentation with Illinois coal and coal products for the purpose of determining the commercial feasibility of methods having commercial possibilities and promise. In the conduct of such program, the commission may employ such assistance and assistants as may be necessary, including commercial research laboratories, to construct experimental ovens and to conduct tests with Illinois coal. The State Geological Survey shall cooperate with the commission, and may, from time to time, give advice upon the commission's work and the tests herein authorized. The members of the commission shall receive only their actual and necessary expenses. The commission shall report the results of the work herein authorized, together with its findings and recommendations, to the Sixty-Eighth General Assembly.

§ 2. The sum of $115,000, or so much thereof as may be necessary, is appropriated to the commission herein created, for the administration of this Act, as follows:

For all expenses incident to the construction, installation and operation of experimental ovens and accessory equipment, salaries and wages _____$ 100,000
For travel and other expenses of the commission_____ 15,000

It also appears from the record that the Singh Company, on August 10, 1951, wrote a letter to the Illinois Coal Products Commission, addressed to the Chairman of the Commission, Senator Roland V. Libonati, confirming a verbal direction of the Chairman to continue the work on the pilot plant, and requesting that the contract be extended and renewed.

Senator Libonati testified that he considered the 1949 contract orally extended, and that he told Dr. Singh "to continue his work, and that the terms of the agreement were the same as those set forth in the 1949 contract". He further testified on cross-examination by re-

spondent that "We extended the contract with Singh Company from the original contract".

Dr. Singh also, on August 10, 1951, submitted a budget estimate in writing to the Commission.

No evidence was offered by respondent rebutting this testimony, nor did respondent make any attempt to establish that the oral extension so testified to was not the action of the Commission. The records of the Commission are in the control of the State of Illinois, and, if the contents thereof supported respondent's contention that the extension was merely the action of the Chairman of the Commission, and that no action was taken by the Commission, as such, then certainly respondent could have easily established this defense. In the absence of any such evidence, we must presume that this action orally extending the 1949 contract was that of the Commission itself, since claimant's testimony was at least prima facie evidence of such fact.

Although the 1949 contract and the oral extension thereof leave much to be desired in many of its provisions, there is no question but that the Commission authorized the Singh Company to act as its agent in procuring the material and services necessary to construct the pilot plant.

There can be no doubt but what the Commission was authorized by the General Asembly to engage in this activity. The 1951 Act recreating the Commission provided: "In the conduct of such program, the Commission may employ such assistance and assistants as may be necessary, including commercial research laboratories, to construct experimental ovens and to conduct tests with Illinois coal". The Commission was limited, however, to the specific sum of $100,000.00 in carrying out this project

through the 1951-1953 biennium. Upon the expenditure or commitment of expenditure of such sum, the power and authority of the Coal Products Commission to incur financial obligations immediately ceased. It, in no way, could bind the State of Illinois beyond the sum of $100,000.00 in such biennium.

In order for any claimant in this case to recover, it is essential that each establish that, at the time the materials and services furnished were contracted for, the Coal Products Commission had the power and authority to contract directly or through their agent for such materials and services, and to incur such an expense.

There appears in the record of this case a certificate of the Auditor of Public Accounts showing the payments made from this appropriation. The appropriation, as of September 30, 1953, lapsed, showing a balance of $64.18. From the certificate of the Auditor, it is apparent that three vouchers, upon which state warrants were issued and charged against this appropriation, should have been charged against the previous appropriation covering the 1949-1951 biennium.

It is noted that voucher No. 2, warrant No. 845707, in the amount of $8,897.46, payable to the Singh Company, covers statements of the Singh Company dated May 10, 1951 and July 10, 1951 for services rendered, and expenses incurred and committed to be incurred during the periods of April 1, 1951 to April 30, and from June 1 through June 30, 1951.

Voucher No. 4, warrant No. 847293, in the amount of $29,864.83, payable to the Cronin Electric Company, covers statements of the Cronin Electric Company for labor and materials. It appears from the Auditor's cer-

tificate that $4,320.00 of such amount was for labor performed during the period of June 1, 1951 to June 29, 1951.

Voucher No. 11, warrant No. 896136, in the amount of $41,532.86, payable to the Singh Company, covers two statements of the Singh Company, one of which was dated June 5, 1951 for services rendered, and expenses incurred and committed to be incurred for the period of May 1 through May 31, 1951, in the total amount of $22,609.23.

It, therefore, appears that the total sum of $35,826.69 was not chargeable against the $100,000.00 appropriation of the Coal Products Commission to be expended during the 1951-1953 biennium, regardless of the fact that the then Auditor charged them against that appropriation.

Sec. 145, Chap. 127, Ill. Rev. Stats., (1951 State Bar Association Edition), provides in part as follows: "No warrant shall be issued by the Auditor of Public Accounts for the payment of money from the State Treasury without the presentation of itemized vouchers showing that the obligations have been incurred against such appropriation".

In determining whether or not an appropriation is depleted, although the Auditor's account will be considered prima facie evidence of the status of the account, it will not be conclusive on the question, if it appears from the evidence that amounts were mistakenly charged against the appropriation.

It follows that, to the extent of $35,826.69, the issuance of the above described warrants did not deplete the 1951-1953 biennial appropriation of the Illinois Coal Products Commission, and consequently did not restrict the power and authority of the Commission to expend that amount.

In determining the merits on the claims before us, it is necessary to examine each claim to determine not only the amount and validity of the respective claim, but also, and equally essential, the date each became an obligation of the Coal Products Commission must likewise be determined. It is obvious that the total amount of these claims greatly exceeds the amount of the appropriation.

Therefore, the order in which these claims are established to have become obligations will determine those which are allowable, and those which are not.

We have examined these claims both individually and collectively, and have found that the following claimants have established by a preponderance of the evidence the elements necessary to a recovery.

Schutte and Koerting Company, A Corporation, sold and delivered to the Illionis Coal Products Commission, through its agent Singh, on February 4, 1952, a certain cast iron Fume Scrubber for the sum of $148.00. This amount represents payment in full of this company's claim.

George Willy Hardware sold and delivered numerous items of hardware to the Coal Products Commission, through its agent, the Singh Company, during the period from August 27, 1951 through December 5, 1951, the value of such materials being $331.71. This claimant also furnished material of a like kind from September 8, 1952 to December 15, 1952 in the amount of $95.20. A claim for those items cannot be allowed, inasmuch as the Commission had no power to contract such indebtedness at those times, since the appropriation was then completely exhausted.

Crane Company, A Corporation, sold and delivered to the Illinois Coal Products Commission, through its

agent, the Singh Company, plumbing and heating supplies on various dates from November 2, 1951 through February 10, 1952 in the total sum of $3,416.84. Its claim in that amount should be allowed.

This claimant also furnished material of like kind from April 7, 1952 through September 22, 1952. Claim for these items cannot be allowed, inasmuch as the Commission had no power to contract such indebtedness at those times, since the appropriation was then completely exhausted.

Farris Engineering Corporation received a purchase order dated October 11, 1951 from the Singh Company by which four safety relief valves were ordered for the Coal Products Commission to be delivered to the pilot plant. The order was not for stock items, but required special work on the part of Farris. Three of these valves were completed and delivered to the Commission, the fourth being cancelled by the Singh Company. The Commission became obligated to this claimant at the time these materials were ordered and work on the fabrication of such articles commenced, which work was commenced soon after receipt of the order. At that time there were sufficient funds available in the appropriation to cover such expenditures. The three valves were delivered as soon as they were completed, and at that time claimant invoiced the Coal Products Commission. The amount of this claim should be allowed in the sum of $774.35, which represents payment in full of this company's claim.

Joseph Cronin, doing business as the Cronin Electric Company, was employed by the Chairman of the Coal Products Commission directly. At the time of the hearing Mr. Cronin was deceased, having died subsequent to the filing of the claim. There has been filed in this Court a

certified copy of Letters of Administration issued to Luella C. Cronin as Administrator of the Estate of Joseph E. Cronin, deceased. She, as such administrator, is considered to be the present claimant.

The only witness testifying on behalf of claimant was Senator Roland V. Libonati. He testified that he, as Chairman of the Coal Products Commission, employed Joseph Cronin, doing business as the Cronin Electric Company, to do work at the pilot plant. He testified that the Commission generally supervised the construction of the pilot plant building. He further testified that the bills for material, labor and services of the Cronin Electric Company were submitted to the Commission from time to time as the work was done. He further testified that Cronin worked directly under the Commission, although still subject to Dr. Singh's orders.

His testimony regarding the reason for his hiring Cronin directly was as follows:

"Q. Mr. Cronin was not retained by Dr. Singh?
A. No, he was not. Cronin was directly under the Commission. I will tell you why. Dr. Singh was building a plant. A plant of this type had never been built, and from day to day, Dr. Singh would direct the men on building the plant. From time to time, he would have some plans, but otherwise it was purely building a plant with the formula and understanding he had as an engineer.

I had to make arrangements with the different unions, as he understands, which he could not do, relative to this work. They were electricians, some of them worked as painters, some of them worked as machinists, and some of them worked as concrete men, as they were needed. There was not a full week's work for electricians.

We arranged with labor to hire those various trades, which they ordinarily have, in view of the fact that it was an experimental plant. On experimental plants, wages for electricians run seven and a half to eight dollars an hour. Cronin agreed to service the plant with men at five dollars and fifty cents an hour. That is why he was directly under the Commission. Of course, Dr. Singh gave him his orders as far as his work was concerned.

Q. But he was generally directly under your supervision and control?
A. Yes."

He further testified that the Commission checked his work from time to time through men they had at the plant. Two exhibits were offered into evidence. Claimant's exhibit No. 1 was an invoice of the Cronin Electric Company, bearing date of June 19, 1953, directed to the Illinois Coal Products Commission. It reads as follows:

"Electrical wiring at Illinois Coal Products Commission Pilot Plant, 11701 South Ewing Avenue.

Labor and material for the following months from November 14, 1951 to December 31, 1952.

Fluorescent lighting over scale model density and fluidizing scale model.

Flood lighting for fence and entrance to plant.

Inter-communication system from panel board in building to entire plant and buildings on outside.

Lighting over panel board. Installing low water level gauges, and cutouts on 75 H.P. 440 volts compressor.

Wiring electric furnace inside of building.

Wiring thermacouples on scale model of electric furnace.

Lowering control panel on electric coal weighing machine to ground level.

Installing 110 volt outlet plugs for telephone sirens inside plant and outside plant.

Wiring for pitch pump under scale model inside of plant. And removing same from outside of building.

Wiring power outlet plugs for electric strip heaters on entire scale model.

Building and installing electric extensions on electric furnace for scale model.

Wiring service oil burner and oil pump from cement block house to heat generator and superstructure.

Wiring and installing fluorescent lighting over benches in building.

General electrical maintenance on plant.

And all other work, not electrical, ordered by Dr. Singh, but performed by us.

Labor from November 14, 1951 to December 31, 1951_____$ 5,324.00
Labor from January 4, 1952 to December 31, 1952_____ 28,160.00
Material from November 14, 1951 to December 31, 1952____ 7,030.47

Labor and Material _____$40,514.47"

Cronin's exhibit No. 2, dated July 1, 1953, was a statement from the Cronin Electric Company to the

Illinois Coal Products Commission, covering a period from January, 1953 to June, 1953. This exhibit reads as follows:

"Electrical wiring at Coal Pilot Plant—117th and Ewing Ave., general maintenance of said plant as ordered by Dr. A. D. Singh.

| | |
|---|---|
| Labor for month of January—168 hours | $ 924.00 |
| Labor for month of February—160 hours | 880.00 |
| Labor for month of March—176 hours | 968.00 |
| Labor for month of April—192 hours | 1,056.00 |
| Labor for month of May—168 hours | 924.00 |
| Labor for month of June—176 hours | 968.00 |
| Labor | $5,720.00 |
| Material purchased from January 2 to June 30 | $3,484.22 |
| Labor and Material | $9,204.22 |

All electrical materials stored in the two transformer vault rooms. Inventoried by Dr. A. D. Singh on July 8, 1953, and turned over to him.

Total Labor and Materials_____$9,204.22"

Senator Libonati testified that all of the items set forth on these bills had been approved by the Illinois Coal Products Commission. He stated that the bills were not paid "because of the fact that there never was any money". He further testified that there were no items in dispute between Cronin and the Illinois Coal Products Commission.

No one connected with the Cronin Electric Company testified to the details of the work or materials furnished. On the other hand, no witness on behalf of respondent testified regarding this claim. It is obvious from the only evidence before us that most of the work was performed, and the materials furnished after the appropriation account was completely exhausted.

The item contained in exhibit No. 1, "Labor from November 14, 1951 to December 31, 1951" in the sum of $5,324.00, represents a statement of labor performed

within the period of time when the Commission had the power to incur such expense.

It is impossible to ascertain from the other items contained on exhibits Nos. 1 and 2 how much of the labor and material charges were incurred prior to the exhausting of the appropriation.

We will not engage in speculation on this question, and, therefore, recommend that the claim of the Cronin Electric Company be allowed in the sum of $5,324.00, and the rest of the claim denied.

The Singh Company claim falls into three categories:

1. Claims for labor, services and overhead of the Singh Company in the amount of $68,405.34.

2. Claims of the Singh Company for funds expended in payment of suppliers' invoices in the amount of $18,413.64.

3. Claims of some 49 suppliers, who have given powers of attorney to the Singh Company to process their claims.

The 1949 contract, which we have heretofore held was extended to include the 1951-1953 biennium, provided that the Singh Company could make proper charges for overhead, administration, and other charges incidental to its work.

Dr. Singh testified that the charge for overhead was computed on the basis of 50% of the salaries of the men engaged in the work, and his salary of $833.00 per month. He stated that some of the Commission seemed to feel that it was an exorbitant charge. He then contacted C. C. DeLong, Bursar of the University of Illinois, and asked for an opinion on the matter, inasmuch as the University was carrying on research projects for the U. S. Govern-

ment. He stated that Mr. DeLong wrote a letter, which indicated that the University charged the U. S. Government 50% for overhead. Respondent questioned the reasonableness of the overhead figure.

We believe that the Singh Company has failed to bear its burden of proof by a preponderance of competent testimony as to what would be a fair and reasonable charge for the overhead in this particular situation. The letter, which Dr. Singh procured from Mr. DeLong, is not competent evidence of the fact, nor does it pertain to a similar situation.

The Singh Company invoices submitted each month listed the labor services rendered, together with the charges for Dr. Singh's salary during each month. The invoices also listed the materials and supplies, which the Singh Company purchased as agent for the Illinois Coal Products Commission. This latter item contained those which Singh paid for, and those which were contracted for but not paid by the Singh Company.

It has been necessary for us to examine each item individually in order to determine which of them Singh should be reimbursed for, which of them were subjects of the other claimants heretofore considered, and which of them represent claims that the Singh Company is presenting under powers of attorney for the 49 odd claimants referred to in Count II of the Singh Company's complaint.

The evidence regarding the claims of the Singh Company, and those which the Singh Company is handling under powers of attorney was limited to the testimony of Dr. Singh. No witness was called by respondent.

We have concluded, after examining the testimony of Dr. Singh and the numerous exhibits, that the follow-

ing claims presented by the Singh Company should be allowed:

The claim of the Singh Company, as attorney for the Richard H. West Company, should be allowed in the sum of $2,048.00. The Singh Company's invoice of October 5, 1951 established such claim for painting of the plant and buildings.

The claim of the Singh Company, as attorney for the Western Piping and Supply Division of the Lummus Company, should be allowed in the sum of $1,219.54 for furnishing piping for processing vessels set forth in the Singh Company invoices of October 5, 1951 and November 10, 1951.

The claim of the Singh Company, as attorney for Marshall Anderson d/b/a The Welding Shop, should be allowed in the sum of $397.25 for welding services set forth in the Singh invoices of October, November and December, 1951.

The claim of the Singh Company, as attorney for the Henry Pratt Company, should be allowed in the sum of $1,066.00, as stated in the November 10, 1951 invoice of the Singh Company.

The claim of the Singh Company, as attorney for the Grinnell Company, should be allowed in the sum of $901.02 for furnishing brackets, pipe, supplies, plugs, as shown in the Singh Company invoices of December 10, 1951, January 10, 1952 and February 10, 1952.

The claim of the Singh Company, as attorney for the American Boiler and Tank Company, A Corporation, should be allowed in the sum of $369.59 for fabricating and installing spouts, as shown in the Singh Company invoice of January 10, 1952.

The claim of the Singh Company, as attorney for the Johnson Plumbing Supply Company, should be allowed in the sum of $819.20 for furnishing various items of plumbing equipment listed in the January 10 and February 10, 1952 invoices of the Singh Company.

The claim of the Singh Company, as attorney for the South Side Welding Supply Company, should be allowed in the sum of $93.12, as shown in the January 10, and February 10, 1952 invoices of the Singh Company.

The claim of the Singh Company, as attorney for the Anderson Copper and Brass Company, should be allowed in the sum of $1,262.45 for supplying copper tubing, as shown in the January and February, 1952, invoices of the Singh Company.

The claim of the Singh Company, as attorney for Albert M. Levy, for services rendered, as set forth in the February 10, 1952 invoice of the Singh Company in the amount of $141.00 should be allowed.

The claim of the Singh Company, as attorney for the William A. Pope Company, for pipe fitting services should be allowed in the sum of $3,485.79, as set forth in the February 10, 1952 invoice of the Singh Company.

From a consideration of the testimony, together with the exhibits, we have determined that the Singh Company expended sums of money in payment of suppliers' invoices from September 5, 1951 to and including February 10, 1952. These sums are as follows:

| | |
|---|---|
| In September, 1951 | $ 545.82 |
| In October, 1951 | 1,392.99 |
| In November, 1951 | 3,610.64 |
| In December, 1951 | 1,479.41 |
| In January, 1952 | 947.38 |
| In February, 1952 | 648.45 |
| Total | $8,624.69 |

During the same period of time, the Singh Company's charges for labor and Dr. Singh's salary appear to be as follows:

| | |
|---|---:|
| For September, 1951 | $ 1,812.27 |
| For October, 1951 | 2,380.95 |
| For November, 1951 | 2,089.38 |
| For December, 1951 | 1,646.24 |
| For January, 1952 | 1,929.83 |
| For February, 1952 | 2,454.53 |
| Total | $ 12,313.20 |

It, therefore, appears that, as of the March 10, 1952 invoices, the amount of the Singh claim is a total of $20,937.89. This sum exceeded the unexpended balance of the appropriation by $1,222.91. Therefore, the Singh Company claim based upon labor and services of the Singh Company, including Dr. Singh's salary, and the claims of the Singh Company for funds expended in payment of suppliers' invoices could only be allowed in the sum not to exceed $19,714.98.

The record reflects, however, that the Singh Company in its brief has conceded that the state is entitled to a set-off in the amount of $22,971.05 by reason of the payment to the Singh Company of the sum of $20,971.05 for reimbursement to Minneapolis-Honeywell, and $2,000.00 for reimbursement to the Beaumont-Birch Company.

Aside from this acknowledgment of Singh, nothing appears in the record to indicate that Singh was overpaid. Dr. Singh testified with respect to the moneys received by the Singh Company in payment of the monthly invoices, which included the above amounts. He stated that the Singh Company did not pay these sums to Minneapolis-Honeywell and Beaumont-Birch Company for the reason that the Singh Company never received funds

from the state on their monthly invoices until some time had elapsed. Consequently, payments were not always made to suppliers listed in any one month's invoice of the Singh Company. During these periods when the state was behind in making payment to Singh, the company would pay creditors, who had been waiting longer than the ones listed on any one given monthly invoice.

It is apparent that the Singh Company's acknowledgment of the above set-off was intended to apply only to the total amount claimed by Singh. The total amount of Singh's claim exceeds this sum of $19,714.98 by more than that amount. We, therefore, recommend payment of Singh's claim in the amount of $19,714.98.

With respect to all of the other claims presented in in this case, we find from the record that each and all of them must be denied. At the various times the materials and services were furnished, neither the Illinois Coal Products Commission nor its agents, the Singh Company and Dr. Singh, had any power or authority whatsoever to incur indebtedness in any amount, inasmuch as the appropriation was then completely exhausted.

The evidence fails to establish that any of these materials and services were contracted for prior to the exhaustion of the appropriation.

This Court has consistently denied claims for this reason in numerous cases. The Court in *Chicago Printers, Inc., A Corporation,* vs. *State of Illinois,* 8 C.C.R. 583 at 586 stated:

"As the Superintendent of the Division of Printing was without power or authority to contract for work in excess of the amount appropriated by the legislature, the contract so far as it applies to such excess is void, and no award can be made by this Court for the payment thereof."

In *John Lewson* vs. *State of Illinois,* 5 C.C.R. 80, the Court recognized that:

"To allow this claim would be to establish a most dangerous precedent. It would open up the avenue for all state officers and state departments to ignore the limitation of the appropriation for their respective offices or departments, if they saw fit so to do, and rely on the Court of Claims to take care of all claims made in excess of such appropriations."

Other cases in which the Court has followed these fundamental principles are: *Individual Towel and Cabinet Service Company* vs. *State of Illinois*, 6 C.C.R. 406; *Transportation Building Corporation* vs. *State of Illinois*, 6 C.C.R. 423; *Inspectors of the City of Peoria, A Corporation* vs. *State of Illinois*, 12 C.C.R. 17; and *The Board of Education of the City of Chicago* vs. *State of Illinois*, 12 C.C.R. 281.

The claimants contend, however, that the legislature, in 1953, enacted three bills dealing with the Illinois Coal Products Commission's difficulties, and that the effect of these enactments, when viewed together in the light of the circumstances confronting the legislature in the Spring of 1953, amounted to an offer by the state to acquire and perfect title to the pilot plant, so as to assure the cooperation and continuation of the research project in exchange for the sum of $150,000.00 to be distributed to the respective unpaid claimants.

They further contend that, even if the claims are invalid, because of lack of authority on the part of the Commission and its agents to incur the indebtedness, nothing barred the legislature from using the amounts of such claims as the measure or formula for compensation incorporated into the state's offer.

The three enactments of the legislature cited by claimant are as follows:

1. House Bill No. 695, transferred the property and powers of the Illinois Coal Products Commission to the Department of Mines and Minerals. (Laws of Illinois, 1953, page 514.)

2. House Bill No. 953, appropriated $150,000.00 for the Department of Mines and Minerals to meet expenses in "The operation of a coal processing pilot plant in Chicago". (Section 1, Laws of Illinois, 1953, page 524.)

3. House Bill No. 696, appropriated the sum of $150,000.00, "or so much thereof as may be necessary, to the Auditor of Public Accounts for distribution to persons who may be granted awards by the Court of Claims, based upon rights arising out of agreements made with the Illinois Coal Products Commission. No part of this appropriation shall be disbursed except upon the basis of an award made by the Court of Claims in the ordinary conduct of its powers in settling claims against the State of Illinois."

We do not read into these three enactments an offer by the state to "purchase the products" of the unauthorized agreements at an agreed price as contended by the claimant Singh Company.

In the first place, if such had been the legislature's intention, it would have simply and plainly stated such intention.

In the second place, the appropriation prohibits the Auditor from making any disbursements unless the Court of Claims *"in the ordinary conduct of its powers of settling claims against the State of Illinois"* has rendered an award.

This Court's authority and power is subject to the Constitution and laws of the State of Illinois.

We could not, if we wished, disregard any statutory or constitutional provision.

We have no power to either restrict or extend the power of the legislature to pay claims against the state.

The Supreme Court in *Fergus* vs. *Russell*, 277 Ill. 20 at page 25, stated: "The Court of Claims is a statutory body not provided for in the Constitution, and its action can have no effect upon the power of the legislature to pay claims against the state. If the legislature has no such power in any case, favorable action by the Court of

Claims would not give the legislature power to pay such claim by making appropriations therefor. If it has the power to pay claims, it cannot be deprived of it by unfavorable action on such claims by the Court of Claims. The power or lack of power to appropriate money to pay claims depends upon the Constitution and not upon the action of the Court of Claims.''

It necessarily follows then, that, in order to properly perform our function, we should not render a decision recommending the payment of a claim, which is clearly prohibited by the Constitution.

Under the authority of *Fergus* vs. *Brady,* 277 Ill. 272, as cited earlier in this opinion, the legislature was expressly enjoined by Sec. 19 of Art. IV of the Illinois Constitution from appropriating a sum of money to pay a claim previously incurred in excess of an appropriation.

If claimant's position was followed, we would, in effect, be required to presume that the legislature intended to do indirectly through the Court of Claims that which it is expressly prohibited from doing directly by the Constitution. We will not presume any such legislative intention. We believe that the legislature meant for this Court to do exactly what they said, namely, to pass upon these claims ''in the ordinary conduct'' of this Court's powers. This is what we have attempted to do.

Claimant also contends that the legislature specifically directed the Court of Claims to ignore this constitutional prohibition by enacting House Bill No. 1191 in the General Assembly on June 30, 1955. This Bill provides as follows:

"Section 1. The sum of $150,000, or so much thereof as may be necessary, is re-appropriated to the Auditor of Public Accounts for distribution

to persons who may be granted awards by the Court of Claims based upon legal or equitable rights arising out of agreements made with the Illinois Coal Products Commission. No part of this re-appropriation shall be disbursed except upon the basis of an award made by the Court of Claims in the ordinary conduct of its powers of settling claims against the State of Illinois, notwithstanding that at the time of such agreements the amounts for payment thereof were not available."

We do not read such intent into the enactment. Here again, we will not presume that the legislature intentionally disregarded the Constitution.

It is more reasonable to presume that the legislature, in both the 1953 and 1955 enactments, attempted to make available funds out of which the Auditor of Public Accounts could satisfy any awards "made by the Court of Claims in the ordinary conduct of its powers of settling claims against the State of Illinois" as expeditiously as possible, so that the successful claimants would not be required to await the confirming action of the legislature as long as the total sum did not exceed $150,000.00.

The concluding words of the 1955 appropriation, namely, "notwithstanding that at the time of such agreement the amounts for payment thereof were not available", are merely directory to the Auditor to the effect that, in the event the Court enter an award, he, the Auditor, might issue the necessary warrants to claimants without further appropriation by the legislature, notwithstanding the fact that some of the awards might include claims on contracts entered into after the original Coal Products Commission appropriations had been expended according to the Auditor's account. This statute concerns only the Auditor, and in no way directs this Court as to what defenses it may or may not consider.

This method of appropriating sums in advance of an award is unusual. The determination of its validity,

however, need not here be made, since the allowance and denial of the various claims in no way depends upon that question.

It is suggested by the Attorney General, as counsel for respondent, that, instead of determining this matter on the basis contended by claimant, it was the intent of the legislature that the payments to the claimants, as determined by this Court, be on a quantum meruit basis.

This theory cannot be applied. It has long been recognized that, where a contract with the State of Illinois is prohibited by law, there can be no recovery upon the quantum meruit theory. *Green and Sons Co.* vs. *State of Illinois,* 9 C.C.R. 218; *Illinois Central Railroad Company* vs. *State of Illinois,* 10 C.C.R. 493; *Schnepp and Barnes* vs. *State of Illinois,* 10 C.C.R. 609; *Lord and Bushnell Co.* vs. *State of Illinois,* 13 C.C.R. 189; and, *Dutton* vs. *State of Illinois,* 16 C.C.R. 64.

It may well be that there are uncompensated claimants, who have performed services and furnished materials at the instance of persons purporting to have state authority to contract. It may seem unjust to such claimants, but as was correctly stated in *Wasson* vs. *State of Illinois,* 10 C.C.R. 493 at 497, ". . . We are compelled to hold that whoever deals with a municipality does so with notice of the limitations on it or its agent's powers. All are presumed to know the law, and those, who contract with it, or furnish it supplies, do so with reference to the law, and, if they go beyond the limitations imposed, they do so at their own peril".

We have, therefore, allowed those claims, which we believe the evidence established as valid contracts, and denied those claims, which did not result from valid contracts.

The claims, which have been allowed, are as follows:

| | |
|---|---:|
| Minneapolis-Honeywell Regulator Company, A Foreign Corporation authorized to do business in Illinois | $ 22,177.33 |
| Beaumont-Birch Company, A Corporation | 2,000.00 |
| Schutte and Koerting Company, A Corporation | 148.00 |
| George Willy Hardware | 331.71 |
| Crane Company, A Corporation | 3,416.84 |
| Farris Engineering Corporation, A Corporation of the State of New Jersey | 774.35 |
| Joseph Cronin, d/b/a Cronin Electric Company | .5,324.00 |
| Singh Company, A Corporation, as attorney for Richard H. West Company | 2,048.00 |
| Singh Company, A Corporation, as attorney for Western Piping and Supply Division of the Lummus Company | 1,129.54 |
| Singh Company, A Corporation, as attorney for Marshall Anderson, d/b/a The Welding Shop | 397.25 |
| Singh Company, A Corporation, as attorney for Henry Pratt Company | 1,066.00 |
| Singh Company, A Corporation, as attorney for Grinnell Company | 901.02 |
| Singh Company, A Corporation, as attorney for American Boiler and Tank Company | 369.59 |
| Singh Company, A Corporation, as attorney for Johnson Plumbing Supply Company | 819.20 |
| Singh Company, A Corporation, as attorney for South Side Welding Supply Company | 93.12 |
| Singh Company, A Corporation, as attorney for Anderson Copper and Brass Company | 1,262.45 |
| Singh Company, A Corporation, as attorney for Albert M. Levy | 141.00 |
| Singh Company, A Corporation, as attorney for William A. Pope Company | 3,485.79 |
| Singh Company, A Corporation | 19,714.98 |
| Total | $ 65,690.17 |