(No. 82-CC-2208)

EASTERN CYCLONE INDUSTRIES INC., f/k/a ECI AIR-FLYTE CORP., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed July 26, 1984.*

*Order on Court's motion filed February 21, 1985.*

JAMES S. BARBER and GARY L. STARKMAN, of ARVEY, HODES, COSTELLO & BURMAN, for Claimant.

NEIL F. HARTIGAN, Attorney General (MARY A. MULHERN, Assistant Attorney General, of counsel), for Respondent.

ROE, C.J.

The Claimant, Eastern Cyclone Industries, brought this claim seeking damages for breach of contract, fraud, and tortious misrepresentation. The facts, as stipulated by the parties, are essentially as follows.

The Claimant is in the business of installing pneumatic conveyors and laundry equipment. On May 16, 1977, the parties contracted for the sale and installation of a pneumatic laundry conveyor and chute system for soiled linen and trash at the University of Illinois Replacement Hospital ("the hospital") in Chicago, Illinois. The contract was numbered 7-1487-4 by the Respondent. The Claimant installed the laundry conveyor and chute system and has been paid *in toto* for that portion of its work.

On July 17, 1978, the Respondent's construction management company, Morse/UBM Joint Venture, asked the Claimant to "proceed with construction" of revisions to the pneumatic linen and trash lines in the basement of the hospital ("relocation work"). The Claimant agreed to do the relocation work for $13,200.00. About a year later the user agency, the University of Illinois, also asked for the Claimant to sell to it and install a Model 140 Linen Collector and the Claimant did furnish and install it at the hospital.

On March 5, 1980, the Claimant submitted a request for proposal and change order on the linen collector for a $34,000.00 contract sum increase. By July 8, 1980, all recommendation and approval signatures had been obtained on the change order except for the final signature of the Respondent (CDB approval) in

Springfield, Illinois. Because of the amount of the change order, CDB approval was required. Robert Pierce, the CDB's manager of its northern regional office, sent the change order to D. Springer, the CDB's Change Order Administrator in Springfield on July 8, 1980. On or about July 15, 1980, Mr. Springer returned the change order to Mr. Pierce unsigned because a drawing had not been submitted with it, even though the user agency, the construction manager, the architect, the engineer and/or the Respondent had a drawing on hand at the time which showed the work related to the change order.

In September of 1980, the Claimant completed the relocation work and by November of 1980 the installation of the linen collector had been completed.

During September and November of 1980 there were sufficient unobligated funds to approve and pay the Claimant the $34,000.00 for the linen collector and the $13,200.00 for the relocation work.

It was not until December 29, 1980, that the change order for the linen collector was resubmitted to the CDB's Springfield office with the drawing for final approval. A week later the Claimant submitted the change order for the relocation work. Sometime in January of 1981, the change order for relocation work had been approved by the user agency's Ken Belford and had been recommended for approval by both the project's architect and construction manager. One Brian O'Connor's signature was stipulated to be the final signature necessary prior to submittal of the change order to the CDB's Springfield office. Mr. O'Connor never signed the change order and it was never submitted for reasons that the parties agree are unknown.

In January of 1981 there were still ample unobligated appropriated funds in the hospital project construction account to approve and pay the Claimant for the work performed pursuant to both change orders.

On June 4, 1981, the Claimant submitted to the Respondent a contractor's affidavit and sworn statement for $47,200.00 for payment for the work covered by both change orders.

At the end of fiscal year 1981 there was $59,571.32 of unobligated funds on hand in the construction account for the hospital project.

On July 29, 1981, the CDB wrote to the Claimant that:

"All appropriate parties have authorized your final payment. However, your change orders Nos. PC-1 and PC-2 (the Relocation Work and Linen Collector, respectively) have yet to be approved due to lack of funds remaining for this project. We regret any inconvenience or hardship this may cause your firm and intend to approve your contract changes as funds become available. Until that time, we can pay you the current balance remaining in your account.

"Should you find the delay in the change order approval unacceptable, your recourse is in the Court of Claims." (Parenthetical explanation added by the stipulation.)

In conclusion, the stipulation states that all problems have been corrected under warranty and the Respondent represented that the amount of released funds which currently are unobligated in the hospital project are $1,807.47.

The Claimant in its complaint and amendment thereto has raised three theories of recovery including breach of contract, fraud, and tortious misrepresentation. The claim is before the Court on the Claimant's motion for summary judgment. Based on the record before us we are unable to say that the Claimant is entitled to judgment as a matter of law.

Essentially, the argument that the contract was

breached by the Respondent is simply that the Claimant performed its part of the agreement for the changes and that the Respondent did not pay the Claimant. The Respondent seeks to deny the existence of the agreement. The Respondent cited Section 7-01 of Article 7 of the general conditions of the contract which Respondent stated provided as follows:

"GENERAL. CDB may, at any time, without notice to the sureties, order changes in the contract time or in work germane to the Contract. The Contractor may initiate requests for changes. Upon issuance of a change order, the Contractor shall promptly proceed with the work as changed. No work shall be changed without written approval of CDB."

The Respondent argues there was no written approval by a person who had authority and it is well-settled law that when dealing with an agent of the State, one is bound to know the extent of his authority, citing *Wilder Mobile Homes, Inc. v. State* (1979), 33 Ill. Ct. Cl. 227. Further, Respondent argues that undue delay in approval of the change orders, if any, is no excuse for the Claimant to have proceeded on its own without approval.

A careful and thorough examination of the entire record in this matter reveals no such language in Article 7 of the contract nor is there even an Article 7. The copy of the contract amended to the complaint and elsewhere in the record contains only two pages consisting of four Articles. The Claimant did not comment on this argument. A genuine issue of material fact is thus presented and thus we are unable to find that the Claimant is entitled to judgment as a matter of law as to this issue.

Aside from the merits of the breach issue on the contract is the Respondent's interposition of the insufficiency or lack of funds defense. At this time it is abundantly clear to this Court that there are now insufficient funds remaining with which to pay this

claim. Regardless of the merits of the Claimant's theory of recovery based on breach of contract we are constrained by law to deny recovery on that basis.

Section 30 of "an Act in relation to State Finance" (Ill. Rev. Stat. 1981, ch. 127, par. 166) provides as follows:

"No officer, institution, department, board or commission shall contract any indebtedness on behalf of the State, nor assume to bind the State in an amount in excess of the money appropriated, unless expressly authorized by law."

Even if there were sufficient funds to cover the costs of the change orders when they were negotiated (even if never finally approved), there are now insufficient funds to pay claims arising from this project. Claimant cited *Schutte and Koerting Co. v. State* (1957), 22 Ill. Ct. Cl. 591, as authority to pay this claim. *Schutte, supra*, was overruled in *Hall v. State*, 78-CC-0895, decided December 27, 1979, reported at 33 Ill. Ct. Cl. 364, but as an unpublished opinion. There, that Court stated:

"However, in *Schutte*, (supra), rather than to deny all claims outright, this Court took one step beyond their holding in *Board of School Inspectors of the City of Peoria v. State*, (supra) and held that where sufficient funds were available at the time the contract was entered into, the Court would honor the contract even though the contract was not paid before the funds available were totally expended.

The Court went on in the *Schutte*, (supra), case to hold that any contract entered into, after the appropriation had become totally obligated, would be denied.

It is important in applying the principle set out in *Schutte* (supra) to distinguish between the balance of the appropriation left unobligated and the balance of the appropriation actually remaining on hand. To allow a claim, simply because the amount actually being held on the date the obligation is incurred equals or exceeds the obligation, could lead to overspending by the agency and deficiency appropriating by this Court.

This approach also could not guarantee that invoice vouchers prepared after the funds are fully obligated would not be processed and paid leaving no funds for obligations incurred at an earlier date. For this reason, we repudiate that portion of *Schutte and Koerting Co., Et Al. v. State of Illinois*, 22 Ill. Ct. Cl. 591, case which allows awards simply because the line item appropriation was not shown on the books of the agency as being fully obligated on the date the 'debt' was incurred . . . ."

It is inherent in the administration of State government that expenditures should not exceed appropriations previously made with the possible exception set forth in the case of *Fergus v. Brady,* (supra) where the expenditure is strictly prescribed by the legislature and the spending agency is compelled by circumstances and law to obligate the State. This appears to be a permissible (and expeditious) delegation of authority by the Legislature.

Without strict and well enforced guidelines, the spending of State officials could become rampant."

Under the holding in *Hall, supra,* this claim cannot be paid because there are now insufficient funds remaining to pay the claim. The fact that there may have been sufficient unobligated funds remaining when the work was begun or partially sufficient unobligated funds available when the work was completed is not relevant at this time. For us to make an award on the breach of contract theory under this set of facts could only be described as making a deficiency appropriation and a usurpation of the legislative prerogative.

Citing *State Employees Retirement System v. State* (1970), 32 Ill. Ct. Cl. 158, Claimant argues that, even where the payment would exceed the sum appropriated, this Court can make an award where the obligation is expressly required by law. This exception to the rule is extremely narrow and must be cautiously applied. In *Fergus v. Brady* (1927), 277 Ill. 272, 115 N.E. 393, a case often cited in opinions of this Court, the Illinois Supreme Court stated at page 279:

"That authority is express which confers power to do a particular, identical thing set forth and declared exactly, plainly and directly, with well defined limits, and the only exception under which a contract exceeding the amount appropriated for the purpose may be valid is where it is so expressly authorized by law. An express authority is one given in direct terms, definitely and explicitly, and not left to inference or to implication, as distinguished from authority which is general, implied or not directly stated or given. An example of such express authority is found in one of the deficiency appropriations to the Southern Illinois Penitentiary which had been paid, and serves only as an illustration. The authorities in control of the penitentiary are required by law to receive, food, clothe and guard prisoners convicted of crimes and placed in their care, involving the expenditure of

money, which may vary on account of the cost of clothing, food and labor beyond the control of the authorities, and which could not be accurately estimated in advance for that reason or by determining the exact number of inmates."

Claimant urges us to find express authorization in section 9.02 of the Illinois Purchasing Act. In relevant part said statute provides as follows:

"No amounts of funds in addition to that provided for in a contract for repairs, maintenance, remodelling, renovation or construction may be obligated or expended unless the additional work to be performed or materials to be furnished is germane to the original contract.

Even if germane to the original contract, no additional expenditures or obligations may, in their total combined amounts, be in excess of the percentages of the original amount set forth in subsection (b) of this section, unless they have received prior written approval of the Capital Development Board.

In event that the total of the combined additional expenditures or obligations exceed the percentages of the original contract amount set forth in subsection (b) of this section then the Capital Development Board shall investigate all additional expenditures or obligations and state in detail the reasons for such approval or disapproval.

(b) . . .

Whenever the contract amount is in excess of $500,000.00, the percentage shall be 3% of the amount about $500,000.00 plus $25,000.00."[1]

Although the extra work, the relocation and linen collector work, were germane to the original contract, we do not view the quoted language as expressly requiring payment.

Authorization for virtually every expenditure of State funds can be traced to a statute or an inference to be drawn from statute. The question is often one of degree. The situation here with this "authorization" we do not feel, rises to the level described in *Fergus, supra.* The obligation should contain the same element of need and exigent circumstances or at the very least be a clear

---

1. Claimant's original contract was in the amount of $507,000.00. Their change orders totalling $47,200.00 are far in excess of the 3% limit and *prior* written approval from the CDB was not obtained.

and unequivocal directive to pay or incur an obligation. The "authorization" quoted above is rather a limitation on an agency's power to spend. It does not say that the State shall pay for the work contemplated by the change orders herein. The statute allows the agency to forego other provisions of the Illinois Purchasing Act and the rules and regulations thereunder when certain extras on contracts fall within the parameters of the statute. This "authorization" must be limited to availability of the appropriations.

We cannot make an award on the breach of contract theory, despite the obvious equities in favor of the Claimant, under the facts of this case. To do so would be to condone irresponsible overspending by State agencies.

Claims based on fraud and tortious misrepresentation sound in tort and as such are not susceptible to the defense of lack or insufficiency of appropriations in this Court.

The courts do not always clearly distinguish between fraud and tortious misrepresentation. (*Mother Earth Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393.) *Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651, 418 N.E.2d 506, states that the tort of misrepresentation involves fraud. It appears that the key differences for purposes of our discussion here are the elements of *scienter* and the burden of proof.[2] For a

---

2. The most significant difference concerns the potential for, and virtually unlimited liability to, unknown plaintiffs as noted by Justice Cardozo in the leading case of *Ultramares Corporation v. Touche* (1931), 255 N.Y. 170, 174 N.E. 441, and which was restricted in Illinois by the Illinois Supreme Court in *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656. The ambit of liability for negligent misrepresentation is more confined (than for fraud) and will only attach if reliance by the particular plaintiff could be contemplated. This important difference is not of consequence in the claim at bar.

statement to constitute fraud it must be shown to be (1) material, (2) false, (3) known by the person making it to be false, believed by the person making it to be false, or made in culpable ignorance (sometimes referred to as being made with reckless disregard) of its truth or falsity, (4) justifiably relied upon by the victim, (5) made for the purpose of inducing the reliance, and (6) such that the victim's reliance caused him to suffer pecuniary loss. The party claiming fraud has the burden of proving its case by clear and convincing evidence.

As alleged in the Claimant's amendment to its complaint (count II, par. 30) and as set forth in Claimant's memorandum in support of summary judgment, the following statement taken from a letter from the CDB to the Claimant dated July 29, 1981, was the actionable misstatement:

"All appropriate parties have authorized your final payment. However, your change orders Nos. PC-1 and PC-2 (the Relocation Work and Linen Collector, respectively) have yet to be approved due to lack of funds remaining for this project. We regret any inconvenience or hardship this may cause your firm and intend to approve your contract changes as funds become available. Until that time we can pay you the current balance remaining in your account.

Should you find the delay in the change order approval unacceptable, your recourse is in the Court of Claims." (Parenthetical explanation added).

It was agreed that as of the date the letter was written approximately $26,721.00 of unobligated funds remained in the construction account, enough to have paid the Claimant for all of Change Order 30-PC-2 and part of 30-PC-1.

The Respondent rationalizes the apparent misrepresentation by pointing out that there is nothing in the record to indicate the total amount of other change orders pending at the time and adding that it believed that there were insufficient funds to pay all the change

orders in progress. Respondent also asks us to take judicial notice of the fact that there are six other claims involving the University of Illinois Replacement Hospital seeking a total of $2,069,852.15 including:

1) *Woodwork Corporation of America v. State*, No. 80-CC-1336 for $400,000.00;

2) *F. E. Moran, Inc. v. State*, No. 82-CC-0397 for $35,000.00;

3) *Bertrand Goldberg Associates v. State*, No. 82-CC-2060 for $693,123.66;

4) *L. K. Comstock & Co., Inc. v. State*, No. 82-CC-2350 for $299,207.34;

5) *Morse/Diesel, Inc. v. State*, No. 83-CC-0155 for $609,590.39;

6) *Robertshaw Controls Co. v. State*, No. 83-CC-2560 for $32,930.76.

We do take notice of the fact that those claims are on file but unless the Respondent is willing to concede for the record that there is any merit to them (which Respondent had not done at the time the briefs were filed in this case—in fact a general denial was deemed filed in every one of them) we cannot find their existence relevant to the issues herein. Moreover, any merit to those claims may indicate widespread fraud in the inducement of all the claimants to perform work while the CDB knew or should have known that an insufficient amount of funds was available to pay for the goods and services rendered.

However, assuming arguendo that the first three elements of fraud set forth above have been shown, we

are of the opinion that the last three elements are unsupported by the record. The quoted misstatement was not shown to have been made to induce reliance. Falsely representing that Respondent lacked funds to pay the Claimant can hardly be described as an inducement to be relied upon and the Claimant was told it had recourse in the Court of Claims.

We also do not think the record shows that the Claimant did rely on the alleged misstatement. It is the Claimant's position that as of July 29, 1981, it had already completed its construction. There does not appear to have been anything the Claimant could have done to collect its bill. The only apparent alternative was to file suit in the Court of Claims which was suggested in the letter but which the Claimant did not do until eight months later.

Forebearance from taking action, under certain circumstances, can satisfy the reliance requirement, but there is nothing in the record to indicate how Claimant's inaction caused pecuniary loss. The pecuniary loss had been suffered prior to the making of the alleged misstatement and it does not appear in the record how the Claimant's position changed in any way after the alleged misstatement.

Accordingly, the Claimant's motion for summary judgment on the fraud count is hereby denied.

The tort of negligent misrepresentation, Claimant's third theory of recovery in this claim, entails the basic elements of a negligence action including duty, breach of duty, proximate cause, and damages. The element of *scienter* required in an action for fraudulent misrepresentation is not present. A misrepresentation need only

to have been shown to be negligent. The burden of proof is by the lesser standard of preponderance of the evidence rather than by clear and convincing evidence.

*City Savings & Loan Association v. Fischer* (1966), 67 Ill. App. 2d 315, 214 N.E.2d 612, and *Duhl v. Nash Realty Inc.* (1982), 102 Ill. App. 3d 483, 429 N.E.2d 1267, (the latter cited by the Claimant), have endorsed the American Law Institute's stance on what constitutes negligent misrepresentation:

"One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by reliance upon the information if

(a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and

(b) harm is suffered

(1) by the person or one of the class of persons for whose guidance the information was supplied; and

(2) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith."

Typical cases involve errors by public weighers, accountants, appraisers, and architects.

The Claimant alleges that the CDB's statement of July 29, 1981, quoted earlier, was the negligent misrepresentation. The duty of the CDB was alleged to be to pay the Claimant for the work it did and/or exercise due care in the connection therewith. (Count III, par. 77). Claimant elaborated on the Respondent's duty in its brief by stating that the Respondent had a duty to pay the Claimant before (the Respondent) depleted the construction funds account and/or not to deceive the Claimant into believing there were insufficient unobligated funds to pay while the Respondent paid other contractors instead of the

Claimant. Claimant also added in its brief the allegation that the Respondent had a duty to process change orders timely. It is clear that the misrepresentation alleged could only have breached the alleged duty not to deceive the Claimant into believing that there were insufficient funds available to pay the Claimant (assuming the existence of such a duty) and then no harm was shown. The Claimant has not demonstrated reliance. The Claimant's harm was suffered prior to the misstatement and not because of it. According to standard negligence analysis the alleged misstatement was not shown to be the proximate cause of the Claimant's damages. Accordingly, Claimant's motion for summary judgment on the negligent misrepresentation count is hereby denied.

There is nothing in the record to support the prayer for relief seeking costs, attorney's fees, and punitive damages and therefore these too cannot be awarded on the motion for summary judgment.

Seven months after the alleged misstatement, on February 3, 1982, the CDB, apparently at the Claimant's behest, acknowledged in writing that the Claimant had satisfactorily completed all the work on the original contract, the relocation work, and on the linen collector. The CDB wrote Claimant as follows:

"Per your request, we are writing to acknowledge that ECI has satisfactorily completed all work on both the original contract of $509,000.00 and the pending change orders nos. 30-PC-1 and 30-PC-2 in the amounts of $34,000.00 and $13,200.00, respectively.

We reiterate our intent to approve your contract changes as funds become available and shall expedite any further payments due ECI when the system's problems covered under warranty have been corrected."

It was stipulated that all problems have been corrected under the warranty. There is nothing in the record as to what these problems were or when they were corrected.

However, in conclusion we find that the Claimant has provided $47,200.00 worth of goods and services to the Respondent and to the Respondent's satisfaction. The Respondent is unable to pay for these goods and services now due to lack of funds, but the Respondent would pay for them if funds were available now. The record as it presently exists does not support Claimant's allegations of fraud or negligent misrepresentation. Motion for summary judgment denied.

## ORDER ON COURT'S MOTION

ROE, C.J.

This cause comes on to be heard on the Court's own motion, and the Court being fully advised;

The Court hereby finds that the Claimant's cause of action has been satisfied.

Wherefore, it is hereby ordered that this cause be, and hereby is, dismissed.